## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

The ACT-1 Group, Inc. d/b/a
ACT-1 Personnel Services,

                   Plaintiff,          Case No. 13-cv-13397
                                      Hon. Judith E. Levy

    v.

Alternative Care Staffing,
Inc.; Evanston Insurance Company, and
Markel Corp. d/b/a Markel
Shand Corp.,

                   Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [18]

This is an insurance contract case. Pending is defendants Evanston Insurance Company ("Evanston") and Markel Corporation's ("Markel") motion for summary judgment. (Dkt. 18.)

I.      Background

      i.     The Brown Litigation

On March 6, 2007, Gloria Brown died at the Henry Ford Hospital in Detroit, Michigan while being treated by Alisha Noel, a nurse employed by defendant Alternative Care Systems ("ACS"). The Henry

1

Ford Health System ("HFHS") contracted with plaintiff, ACT-1 Group, Inc. ("ACT-1"), a staffing company, to provide nursing staff for HFHS hospitals.  (Dkt. 28-4 at 2.) ACT-1 then subcontracted with ACS to provide the Henry Ford Hospital with nurses.  (Id.)

On August 21, 2008, the estate of Gloria Brown sued HFHS for medical malpractice, alleging that Noel was negligent in treating Brown ("the Brown litigation").  (Dkt. 28-4 at 4.)  The Estate of Gloria Brown did not name ACS or Evanston as defendants in that lawsuit. (Id.)

At some time between January and March of 2010, the Brown litigation settled for $877,243.03.  (Id.)  Neither ACS nor Evanston participated in that lawsuit or settlement.  (Id.)

On September 10, 2010, HFHS sued ACT-1 and ACS in Michigan state court for indemnification in the Brown lawsuit.  (Dkt. 1-2 at 147.) The court entered judgment against ACT-1 and ACS in that suit for $877,247.03.  (Dkt. 1-2 at 159.)

ii.    ACS' Insurance Policy

ACS purchased medical malpractice insurance through Evanston from May 28, 2008 to May 28, 2009.  (Dkt. 28-5 at 2.)  Evanston is a

subsidiary of Markel.  (Dkt. 28-17 at 3.)  ACS' 2008-2009 policy with Evanston had a retroactive date of May 28, 2003, meaning that the policy would cover incidents occurring between May 28, 2003 and May 28, 2009.  The retroactive date applied because ACS had maintained continuous coverage with Evanston from May 28, 2003, until May 28, 2009.

However, ACS financed its insurance premiums through loans from the National Premium Budget Plan (NPBP), and the NPBP cancelled ACS' insurance policy when ACS failed to make its monthly payments on the loan.  (Dkt. 28-2 at 3.)  ACS' policy was cancelled effective March 25, 2009.  (Id.)  Between March 25, 2009 and June 24, 2009, ACS did not have medical malpractice insurance coverage through Evanston.  (*See* id.)

On June 23, 2009, as a part of the process required to secure coverage through Evanston again, ACS' office manager, Raquel Corner, filled out and signed Evanston's Application for General Liability Insurance and verified that no "claim or suit [had] been brought against [ACS] and/or any of [ACS'] employees" at that time.  (Dkt. 28-8 at 6.)  In the application, she also confirmed that she was unaware of "any

3

circumstances which may [have] result[ed] in a malpractice claim or suit being made or brought against [ACS] or any of [ACS'] employees." (Id.)   As a result of the application, ACS began a new Evanston insurance policy on June 24, 2009, with no retroactive coverage.   (Dkts. 28-17 at 8; 28-2 at 4.)  That policy lasted until June 24, 2010.  (Dkt. 28-2 at 4.)

### iii.   HFHS Contacts ACS

On September 2, 2008, Elizabeth Amaru, an associate of HFHS' attorney, Anthony Paradiso, called ACS regarding Alisha Noel.  (Dkt. 28-20 at 4; *see* Dkt. 28-9.)   Amaru does not remember the exact communication, but she believes that she contacted ACS to explain the significance of the Brown litigation and tell ACS that they were being sued.  (Id. at 4-5.)   On September 9, 2008, Paradiso sent a letter to Corner asking her to tell ACS about the Brown litigation.  (Dkt. 28-9.) In his deposition, Paradiso referred to this letter as a "notification letter" that contained "no claim request."  (Dkt. 28-19 at 7.)   Corner testified that she cannot remember exactly what she did with the letter after receiving it, but that she likely passed it on to Tabitha Magotti,

4

the owner of ACS, to give to Evanston because that is what she normally would have done with such a letter. (Dkt. 28-18 at 5-6, 12.)

No one at Evanston or on behalf of Evanston had any discussion with the owners of ACS or Corner until Fall 2009. (Dkts. 28-2 at 7; 28-17 at 10-11, 12.) On September 15, 2009, an insurance broker forwarded the Brown litigation papers, including the May 11, 2009 claim from Paradiso, and a copy of an email from ACT-1's attorney to the claims services manager at Markel. (Dkt. 28-2 at 7.) Two days later, John Foley, the claims manager for Evanston, contacted ACT-1's attorney for additional information. (Dkts. 28-17 at 14, 15; 18-12.) Foley then assigned the claim to Jagady Blue, senior claims manager for Markel, for handling. (Dkts. 28-17 at 15; 28-14 at 2.) Blue searched the record and concluded that no claim was made against ACS during ACS' policy period that would have triggered coverage. (Dkt. 28-2 at 6.) ACS' policy through Evanston expired on June 24, 2010.

    iv.    Indemnification Suit

On September 10, 2010, HFHS sued ACT-1 and ACS in Michigan state court for its settlement costs, plus additional costs and fees. (Dkt. 1-2 at 147.) On August 5, 2011, that court ordered ACT-1 to indemnify

HFHS and entered judgment against ACT-1 for $877,243.03. (Id. at 159.)

ACT-1 sued ACS, Evanston, and Markel on July 15, 2013, claiming that ACS breached its subcontracting agreement by failing to indemnify ACT-1 in the Brown litigation. (Id. at 4.) ACT-1 also sued Evanston and Markel as a third-party beneficiary under MCL § 600.1405, claiming that Evanston breached its 2008 insurance agreement with ACS by failing to indemnify ACS in the Brown litigation. (Id. at 5; Dkt. 18-4 at 4-5.) ACT-1 alleges that since Evanston could have indemnified ACS in the Brown lawsuit, ACT-1 is now entitled to sue Evanston as a third-party beneficiary to enforce the ACS-Evanston insurance contract. (Dkt. 28 at 4.)

ACT-1 has been unable to serve ACS, and ACS has never made an appearance in this lawsuit.

On September 26, 2014, defendants filed a motion for summary judgment on two issues: (1) whether plaintiff ACT-1 properly filed an insurance claim with defendant ACS during the period of ACS' insurance coverage, and (2) whether Markel is an insurer. (Dkt. 18.)

6

## II.    Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248. The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley, Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002)).

## III.    Analysis

Plaintiff argues that it provided proper notice to ACS and Evanston under the contract. It argues that it notified ACS of a claim directly by virtue of phone calls on September 2, October 17, and October 20, 2008, and a letter dated September 9, 2008. (Dkt. 30 at 4, 5, 8, 12.) Plaintiff argues that it notified Evanston indirectly as a result of those same communications with ACS. (Id. at 5, 12.)

Defendant moves for summary judgment on two grounds: (1) that ACT-1 failed to file a claim with ACS or Evanston during the period of ACS' insurance coverage and (2) that Markel Corporation is not an insurer.

Under Michigan law, which governs this contract, when a contract involves "plain and unambiguous contract terms," those terms must be interpreted in their "ordinary and common meaning without further construction." *Mich. Chem. Corp. v Am. Home Assurance Co.*, 728 F.2d 374, 377 (6th Cir. 1984). The General Liability portion of ACS' insurance contract defines a claim as a "notice received by the [i]nsured of an intention to hold the [i]nsured responsible for: (1) a [b]odily [i]njury." (Dkt. 28-9 at 17.) The Professional Liability portion of that contract defines a claim as "a demand received by the [i]nsured for monetary damages or services." (Id. at 8.)

In Michigan, an insurance claim must convey an intention to hold responsible the entity against whom the claim was filed. *See Continental Cas. Co. v. ENCO Assocs., Inc.*, 66 Mich. App. 46 (1975); *Central Wholesale Co. v. Chesapeake & O.R. Co.*, 366 Mich. 138 (1962). In *Central Wholesale Co.*, a produce buyer and a railroad inspector filed

8

a joint report indicating that a shipment of fruits and vegetables the buyer had ordered had arrived damaged and spoiled. *Central Wholesale Co.*, 366 Mich. at 142-43. Although the joint report notified the seller that the buyer had suffered harm, the Court held that the joint report did not constitute a valid insurance claim because the report did not formally or informally demand payment from the shipper. *Id.* at 149. In contrast, in *Continental Cas. Co.*, when the plaintiff's architect notified the defendants' representative that design faults had been discovered and expressly stated that plaintiffs would be holding defendants liable for the cost to repair the harm, the notification constituted a valid insurance claim. *Continental Cas. Co.*, 66 Mich. App. at 50-51.

> 1.    Whether ACT-1 Notified ACS of a Valid Insurance Claim During ACS' First Policy Period

ACS' insurance contract provides claims-made coverage, which means that only claims first made during the policy period will be covered. (Dkts. 28-10.) ACS was covered by Evanston insurance from May 28, 2003 to March 25, 2009, under a policy with a retroactive date of May 28, 2003, and from June 24, 2009 to June 24, 2010, with a retroactive date of June 24, 2009. (Dkts. 28-5; 28-17 at 8-9.) The

9

retroactive dates in the policies bar claims first made against the insured before those dates. Accordingly, plaintiff must show that HFHS first made a claim against it during one of these policy periods, or that there is a genuine issue of material fact about HFHS having done so.

        i.     Insufficient Evidence of a Written Claim

On September 9, 2008, Paradiso sent a "notification letter" to the office manager of ACS notifying ACS that HFHS had been sued for medical malpractice. (Dkt. 28-11.) The text of this letter, in full, reads:

> Per our conversation of September 2, 2008, we are attaching a copy of the Summons and Complaint served upon Henry Ford Hospital with regard to the above-captioned matter. As we told you, it is our understanding that the nurse who cared for Brown on January 13-14, 2006, was Alisha Noel, who was employed by your agency. For your information, we have also attached a copy of the nursing flow sheets from that day with Noel's signature.
>
> As Noel was your employee, we thought that you should be notified of this action. We would appreciate it if you would forward this information to someone in your company who would be able to discuss this situation with us.
>
> We would appreciate hearing from you at your earliest convenience.

(Id.)

This letter contains no indication that HFHS intended to hold ACS liable, and under the plain language of the contract, it could not

constitute a valid insurance claim. Like in *Central Wholesale Co.*, where a joint report of harm was not a valid claim when it lacked a demand that the shipper pay for the harm, Paradiso's "notification letter" also was not a valid claim because it lacked a demand that ACS pay for the harm that was the subject of the Brown litigation. *Central Wholesale Co.*, 366 Mich. at 149.

On May 11, 2009, eight months after sending the first letter, Paradiso sent a second letter to the office manager of ACS. (Dkt. 28-12.) This letter stated that HFHS "ha[s] provided [ACS] with a copy of the Summons and Complaint which [have] been served upon Henry Ford Hospital." (Id.) It then conveyed the intent to hold ACS liable for the harm caused by ACS' employee, Noel, advising ACS that HFHS had decided to apply the contract provision requiring ACT-1 to indemnify and defend HFHS with regards to the claims against Noel. (Id.) The letter further counseled ACS that "it will be important for ACS to contact Noel and make arrangements for representation." (Id.)

However, Paradiso's letter of May 11, 2009 was sent and received in the three-month period during which ACS lacked Evanston insurance. ACS' 2008-2009 policy was cancelled on March 25, 2009,

11

and its next policy began on June 24, 2009, with a retroactive date of June 24, 2009. (Dkt. 28-17 at 8-9.) Because ACS first received Paradiso's insurance claim on May 11, 2009, during the three-month period in which ACS lacked insurance coverage, Evanston is not contractually bound to provide insurance coverage for any restitution related to the Brown litigation that ACS may have to pay.

ii.     Insufficient Evidence of a Verbal Claim

Under Michigan law, a valid insurance claim may be made through communication methods other than writing, including a phone call. *Continental Cas. Co.*, 66 Mich. App. at 50-51.

Amaru, Paradiso's assistant, testified that she thinks she may have called ACS several times during September and October of 2009, though she cannot remember exactly who she spoke with or what they spoke about. (Dkt. 28 at 15-17.) There is no evidence in the record of anyone else calling ACS during ACS' 2008-2009 policy period to make an insurance claim. Defendants argue that Amaru's guesses of what she likely said during these conversations are inadmissible hearsay. (Dkt. 28 at 15-17.)

12

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The Court may not consider hearsay evidence when ruling on summary judgment. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l.*, 412 F.2d 126, 133 (6th Cir. 1969)).

In this case, Amaru's deposition testimony about the content of her phone calls to ACS is hearsay because the testimony is being offered to prove the truth of what Amaru asserted at deposition: that ACT-1 filed a valid insurance claim against ACS during the relevant policy period of ACS' Evanston insurance. Plaintiff does not argue that Amaru's statements fall under any of the hearsay exceptions contained in the Federal Rules of Evidence. Thus, Amaru's deposition testimony about the content of her phone calls to ACS is inadmissible hearsay and the Court cannot consider it in the determination of this motion.

2.      Whether ACT-1 Notified Evanston of a Valid Insurance Claim During ACS' First Policy Period

There is insufficient evidence in the record for a reasonable juror to conclude that that ACT-1 notified Evanston directly during ACS' 2008-2009 policy period of an intention to hold ACS and Evanston liable

13

for the harm suffered by Gloria Brown or the damages the state court had ordered against ACT-1. Evanston has no record that anyone working for Evanston or on behalf of Evanston had any discussion with the owners of ACS or with Corner before receiving written notice of the claim in the fall of 2009. (Dkt. 28-17 at 10-11, 12.) Plaintiff has provided no other evidence showing that Evanston was made aware of a claim during the relevant period.

3.      The Issue of Whether Markel is a Valid Insurer is Moot

Because there is insufficient evidence for a reasonable juror to conclude that ACT-1 properly filed an insurance claim against ACS during the period of ACS' Evanston insurance coverage, summary judgment must be granted. Thus, the Court need not determine whether defendant Markel is a valid insurer because Markel would not be obligated to provide coverage even if it were.

IV.   Conclusion

For the reasons set forth above, it is hereby ordered that:

Defendant's motion for summary judgment (Dkt. 18) is GRANTED;

14

Plaintiff's claims against defendants Evanston and Markel are DISMISSED WITH PREJUDICE; and

The claims plaintiff, a Michigan corporation, asserts against ACS, also a Michigan corporation, are DISMISSED WITHOUT PREJUDICE. The Court lacks subject-matter jurisdiction over the remaining state law claims, as the parties are not citizens of different states as required by 28 U.S.C. § 1332.

IT IS SO ORDERED.

Dated: August 20, 2015          s/Judith E. Levy
Ann Arbor, Michigan             JUDITH E. LEVY
                                United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email of First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 20, 2015.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager